*FILED*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

*JAN 15 PM 3: 35*
*U.S. DISTRICT COURT*
*N.D. OF ALABAMA*

| | |
|---|---|
| **JAMES R. BOSARGE,** | ] |
| | ] |
| Plaintiff(s), | ] |
| | ] |
| vs. | ]   CV-95-N-2652-S |
| | ] |
| **GOVERNOR FOB JAMES, FRANK** | ] |
| **H. BROMBERG, JR., O. H.** | ] |
| **DELCHAMPS, JR., GARRY NEIL** | ] |
| **DRUMMOND, JACK EDWARDS,** | ] |
| **JOSEPH FINE, DR. SANDRAL** | ] |
| **HULLETT, PETER LOWE,** | ] |
| **SIDNEY L. McDONALD, JOHN T.** | ] |
| **OLIVER, JR., MARTHA SIMMS** | ] |
| **RAMBO, GEORGE S. SHIRLEY,** | ] |
| **MAURY D. SMITH, CLEOPHUS** | ] |
| **THOMAS, JR., JOHN RUSSELL** | ] |
| **THOMAS, CORDELL WYNN, in** | ] |
| **their official capacity as** | ] |
| **MEMBERS OF THE BOARD OF** | ] |
| **TRUSTEES OF THE UNIVERSITY** | ] |
| **OF ALABAMA; BOARD OF** | ] |
| **TRUSTEES OF THE UNIVERSITY** | ] |
| **OF ALABAMA; and MIKE ELLIS** | ] |
| **in his individual and official** | ] |
| **capacity** , | ] |
| | ] |
| Defendant(s). | ] |

**ENTERED**

JAN 15 1997

## Memorandum of Opinion

### I.   Introduction.

In this employment discrimination action, a former employee of the University of

Alabama at Birmingham ("UAB"), James R. Bosarge, has brought claims under the Age

Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* (the "ADEA"); Title VII of the

68

Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"); and 42 U.S.C. § 1983 for violation of rights under the First and Fourteenth Amendments to the United States Constitution. Mr. Bosarge has named as defendants the individual members of the Board of Trustees of the University of Alabama in their official capacities (the "Trustees"), the Board of Trustees of the University of Alabama (the "Board"), and Mike Ellis in his individual and official capacities as an employee of UAB.

Specifically, the plaintiff alleges that the defendants discriminated against him because of his age and sex in violation of the ADEA and Title VII when he was terminated from his position as Program Manager II at UAB. He further asserts that the defendants unlawfully retaliated against him by terminating him six months early when he declined to sign a severance agreement in which he would waive all claims against the defendants. Finally, he claims that the defendants' actions deprived him of his First and Fourteenth Amendment rights and therefore violated section 1983. The court, in an order entered on January 12, 1996, dismissed with prejudice the plaintiff's claims brought pursuant to Title VII and the ADEA against the Trustees and Mr. Ellis in his individual and official capacities. This case is presently before the court on the defendants' motion for summary judgment, filed on October 3, 1996. Upon due consideration, the motion will be granted and the action dismissed.

## II.    Undisputed Facts.[1]

The plaintiff was employed at UAB in the Office of Public Relations and Marketing

from March 26, 1976 to April 20, 1994, when his employment was terminated. In 1989, he

was appointed Acting Director of Media Relations, became the Director on May 16, 1991,

upon the recommendation of his supervisor, Mike Ellis,[2] and served in the capacity of

Acting Director or Director for approximately three years. In April of 1993, Ellis asked

Bosarge to resign as Director and to join Ellis in his office as Program Manager II[3] at the

same salary, $49,000 annually. Ellis believed that the plaintiff had a number of extremely

valuable qualities and strengths and created the new position for him in order to help

Bosarge be successful and serve a higher purpose. Bosarge's new position required him

to help Ellis with special projects on an as-needed basis and involved no administrative

responsibilities. Bosarge understood the position to be second in line to Ellis.

UAB's written Personnel Policies and Procedures require that annual performance

evaluations be performed for all employees after they complete their initial probationary

period.   The purposes of the performance evaluation program are to provide an

---

[1] The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994), *cert. denied, USX Corp. v. Cox*, 114 S. Ct. 900 (1995).

[2] Ellis stated on May 15, 1991, that "[i]t is my recommendation that . . . we appoint Jim Bosarge as Director of Media Relations for UAB. Jim has demonstrated to me a professional approach to every project he has been assigned and has been an integral part of our new institutional identity efforts. In short, he has earned this appointment in the heat of battle." *Bates UAB00106.*

[3] Ellis secured approval for the new position from his supervisor, Ken Roozen, and from the President of the University, Charles McCallum. The position was initially called Assistant to Director of Public Relations and Marketing. Upon review of the position by the Office of Human Resource Management, the title was changed to Program Manager II.

opportunity for managers and employees to discuss performance goals and to create a

written record that may be considered when managers make personnel decisions. While

the evaluation policy applied to Bosarge, Ellis did not perform any annual performance

appraisals of the plaintiff. On February 27, 1990, Ken Roozen informed the plaintiff that his

annual evaluation would be delayed up to six months because Ellis had just come to work

at UAB. Ellis never performed the appraisal referred to in that memo, however, nor did he

ever officially appraise in writing the plaintiff's job performance. On February 10, 1992,

however, Ellis stated in a memorandum to Ken Roozen, "[Bosarge] has provided excellent

leadership and initiated several new programs during his brief tenure as director [of media

relations]." *Bates UAB00104*. Further, on September 29, 1992, Ellis awarded the plaintiff

an 8.2% pay increase and wrote that the raise was "to acknowledge the fine work that you

are doing within your department. . . . Again, thank you for the continuing success of your

department." *Bates UAB00043*. There is no written documentation by Ellis that reflects

negatively on Bosarge's job performance as Director of Media Relations.

When Bosarge resigned as Director of Media Relations, a search committee was

formed for the purpose of filling the vacancy. Out of approximately one hundred

applicants, three were chosen for interviews, but the committee ultimately determined that

none of the three were suitable for the position. Ms. Dale Allison contacted Ellis to ask if

he would be interested in her as a candidate for the position. Ellis and Allison had formerly

worked together at the University of Alabama. At that time, Ms. Allison was 37 years old

and was serving as Director of University Relations at the University of Alabama earning

a salary of $60,000 annually. Virginia Gauld, the chairman of the search committee; Ken

4

Roozen, Ellis' supervisor; and Ellis interviewed Ms. Allison and determined they wished to recruit her. The position was upgraded to Assistant Vice President and Director of Media Relations, the salary was enhanced to $70,000 annually,[4] and the supervisory responsibilities were increased.[5] The new position was advertised, but no one other than Ms. Allison was interviewed. Ms. Allison subsequently accepted the position in January of 1994 and began working at UAB on March 1, 1994.

In 1993, the funding source for Bosarge's position as Program Manager II was altered from the Media Relations Account, part of the Central Administration budget, to joint funding from the Insight Account and the International Marketing Account, both part of the Medical Center Marketing budget. Ellis did not inform Bosarge of the funding change at that time. Bosarge's salary was budgeted and funded through September 31, 1994, the end of the 1993-94 fiscal year. In early 1994, however, Ellis became aware that there was going to be a shortage in the Insight and International Marketing Accounts. He did not ask Ken Roozen for any money from Central Administration to fund the plaintiff's salary. On March 3, 1994, Ellis met with the plaintiff and informed Bosarge that he would be terminated because his position was being eliminated due to reorganization and changes in funding. Ellis told Bosarge UAB was offering him a severance of six months salary and use of University equipment so that he could search for other employment. On

---

[4] The funding for the salary increase came from the Media Relations Account, part of the Central Administration budget.

[5] Allison's position had supervisory authority over five senior staff members and a total staff of twenty-three, whereas Bosarge, as Director of Media Relations, had supervisory authority over one senior staff member and a total staff of thirteen. Allison's duties included the duties that had been performed by the plaintiff as Director of Media Relations.

5

March 7, 1994, Bosarge confirmed the meeting in a letter to Ellis, stating that he understood he would be terminated in six months, or sooner if he found employment, but that his presence at work would no longer be required. On March 8, 1994, Ellis wrote Bosarge back, stating that he agreed with the terms and attached an agreement for Bosarge's signature. The agreement provided that the plaintiff would remain employed on full salary and benefits for six months and that if he should become employed during this time, salary and benefits would cease. It also provided that Bosarge would release any claims against UAB. On March 23, 1994, Ellis sent the plaintiff another copy of the agreement and requested that he sign it prior to April 1. On April 1, 1994, Ellis again wrote to Bosarge, stating that Bosarge's employment would be terminated effective April 30, 1994, unless Ellis received the signed agreement by April 8. On or about April 6, 1994, however, Bosarge's attorney wrote to Ellis, stating that the financial terms of the offer were unacceptable and proposed other terms. On April 14, 1994, Ellis wrote Bosarge a letter informing him that his employment with UAB would be terminated on April 30, 1994. On April 28, 1994, the plaintiff filed an EEOC charge, and he was terminated April 30, 1994. He was 51 years old at the time. Around the time of Bosarge's termination, UAB was opening an office in Bogota, Columbia and had plans to open another in Mexico City. Two females who were fluent in Spanish and had international marketing backgrounds were hired to work in newly created positions within the International Marketing Department.

The Media Relations budget for salaries increased $97,400 from 1993-94 to 1994-95, while the Marketing and International Marketing salary budget decreased $7,612 between those two fiscal years. On October 1, 1994, Ellis received a raise of $6,000 annually and

6

Ms. Allison received an additional $3,500 annually.  Both employees are paid from the
Media Relations Account.  Their combined raises in fiscal year 1994-95, totaling $9,500,
exceed the $7,612 shortfall that occurred in the Marketing and International Marketing
salary budget between 1993-94 and 1994-95.

## III.    Summary Judgment Standard.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the
pleadings, depositions, answers to interrogatories, and admissions on file, together with
the affidavits, if any, show that there is no genuine issue as to any material fact and that the
moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party
asking for summary judgment "always bears the initial responsibility of informing the
district court of the basis for its motion, and identifying those portions of 'the pleadings,
depositions, answers to interrogatories, and admissions on file, together with the affidavits,
if any,' which it believes demonstrate the absence of a genuine issue of material fact."
*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  The
movant can meet this burden by presenting evidence showing there is no dispute of
material fact, or by showing that the nonmoving party has failed to present evidence in
support of some element of its case on which it bears the ultimate burden of proof.
*Celotex*, 477 U.S. at 322-23.  There is no requirement, however, "that the moving party
support its motion with affidavits or other similar materials *negating* the opponent's claim."
*Id.* at 323 (emphasis in original).

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving
party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers

7

to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. *Celotex*, 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. *See also Bill Johnson's Restaurants, Inc. v. N.L.R.B.*, 461 U.S. 731, 745 n.11(1983). However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence is merely

8

colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249 (citations omitted). *Accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## IV.    Discussion.

### A.    ADEA Claim.

The ADEA prohibits an employer from discharging an employee on the basis of age. 29 U.S.C. § 631. Individuals who are at least 40 years of age, *id.*, may seek to establish a prima facie case in one of three ways: (1) by direct evidence of discriminatory intent; (2) by statistical proof; or (3) by meeting the four-pronged test set out for Title VII cases in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Carter v. City of Miami,* 870 F.2d 578, 581 (11th Cir. 1989). The only remaining defendant to the ADEA claim is the Board.

#### 1.    Eleventh Amendment Immunity.

The defendants argue that the Board is a state entity entitled to Eleventh Amendment immunity from Bosarge's ADEA claim. *Movants' Initial Submission* at 2. Neither party

9

disputes that the Board and its division, UAB, are instrumentalities of the state of Alabama. *See Harden v. Adams*, 760 F.2d 1158 (11th Cir.), *cert. denied*, *Grimmer v. Harden*, 474 U.S. 1007 (1985) (stating that the Alabama Supreme Court has held that Alabama universities are instrumentalities or agencies of the state); *Hutchinson v. Board of Trustees of the Univ. of Ala.*, 256 So. 2d 281 (1971). Furthermore, section 14 of the Alabama Constitution states "the State of Alabama shall never be made a defendant in any court of law or equity." Ala. Const. of 1901, § 14 (1975). These considerations alone, however, do not guarantee the Board immunity from suit. The court must determine whether Congress has expressly and lawfully abrogated the Board and UAB's immunity from suit under the ADEA. The court concludes that Congress clearly intended to abrogate the states' Eleventh Amendment immunity through the ADEA, for Congress in 1974 amended the ADEA's definition of "employer" to include a "State and any . . . agency or instrumentality of a State." 29 U.S.C. § 626 (b) (2). Such a statement is meaningless, however, if Congress had no power to abrogate Eleventh Amendment immunity in this instance.

The Supreme Court has recently held that the congressional power of abrogation arise only from section 5 of the Fourteenth Amendment. *Seminole Tribe of Fla. v. Florida*, 116 S. Ct. 1114, 1128 (1996). In so holding, the Court overruled its previous decision in *Pennsylvania v. Union Gas Co.*, 491 U.S. 1 (1989), that Congress could abrogate Eleventh Amendment immunity pursuant to the Commerce Clause as well as the Fourteenth Amendment. *Seminole Tribe*, 116 S. Ct. at 1128 ("We feel bound to conclude that *Union Gas* was wrongly decided and that it should be, and now is, overruled.").

Consequently, the court must determine whether the 1974 amendments to the ADEA which, among other things, extended coverage of the ADEA to state governments, *see* 29 U.S.C. § 630 (b) (2), were passed pursuant to section 5 of the Fourteenth Amendment and thus were a valid exercise of Congress' powers of abrogation. The court concludes that they were not.

The legislative history of the ADEA as originally enacted in 1967 does not specifically establish the source of Congress' power in enacting the statute. The history of the 1974 amendments to the Act is more enlightening, however. Congress extended ADEA coverage to the states through the Fair Labor Standards Amendments of 1974. These amendments simultaneously altered the Fair Labor Standards Act (the "FLSA"). The FLSA is indisputably grounded solely in the Commerce Clause. 29 U.S.C. § 202; *United States v. Darby*, 312 U.S. 100 (1941). The House Report on the 1974 amendments, including the extension of ADEA coverage, expressly considered the burdensome effect labor disputes might have on the free flow and marketing of goods in commerce. H.R. Rep. No. 913, 93d Cong., 2d Sess. 2 (1974), *reprinted in* 1974 U.S.C.C.A.N. 55, 2811-12. Therefore, while Congress did not specifically state that the 1974 ADEA amendments were based on its Commerce Clause powers, such would appear to be the case.

The Eleventh Circuit has not yet addressed the issue of whether the Eleventh Amendment precludes ADEA claims against the states in federal court and thus has not stated its opinion as to the ADEA's source.[8] The First, Fourth, Seventh, and Tenth Circuits

---

[8] The matter is currently pending before the Eleventh Circuit, however. *See Kimmel v. Florida Bd. of Regents*, 1996 U.S. Dist. LEXIS 7995 (N.D. Fla. May 17, 1996), *appeal pending*, No. 96-2778 (holding that Congress' statement of intent to abrogate Eleventh Amendment immunity from suit under the ADEA was a valid exercise of

11

have all held that the 1974 amendments were based on the Fourteenth Amendment. *See,*
*e.g., Ramirez v. Puerto Rico Fire Serv.,* 715 F.2d 694 (1st Cir. 1983); *Arritt v. Grisell,* 567
F.2d 1267 (4th Cir. 1977); *E.E.O.C. v. Elrod,* 674 F.2d 601 (7th Cir. 1982); *Hurd v. Pittsburg*
*State Univ.,* 29 F.3d 564 (10th Cir.), *cert. denied,* 115 S. Ct. 321 (1994). These courts have
essentially reasoned that, while Congress did not specifically cite the source of its power
when enacting the 1974 amendments, such a recitation is not necessary. *See E.E.O.C. v.*
*Wyoming,* 460 U.S. 226, 247 n. 18 (1983) (Congress need not "recite the words 'section 5'
or 'Fourteenth Amendment' or 'equal protection.' . . . for '[t]he . . . constitutionality of action
taken by Congress does not depend on recitals of the power which it undertakes to
exercise.'" (citations omitted)). Rather, these courts hold, legislative purpose is
determinative. The 1974 amendments extended the ADEA's age-discrimination protections
to public employees, thus "filling a gap in federal anti-discrimination law left open when
Title VII was passed." *Elrod,* 674 F.2d at 606. The 1972 amendments to Title VII were
expressly enacted by Congress pursuant to its Fourteenth Amendment powers. H.R. Rep.
No. 238, 92d Cong. 3d Sess. 19 (1971); S. Rep. No. 415, 92d Cong., 2d Sess. 10-11 (1971).
*See also Fitzpatrick v. Bitzer,* 427 U.S. 445, 453 n. 9 (1976). Consequently, according to
these courts, the 1974 amendments to the ADEA must likewise be grounded in the
Fourteenth Amendment.

This holding, however, ignores the legislative history of the ADEA amendments, the
fact that the Supreme Court on two occasions has declined to state whether such a holding

---

its power pursuant to section 5 of the Fourteenth Amendment).

is in fact correct, and the opinions of at least four Supreme Court Justices that such a conclusion is incorrect. In *E.E.O.C. v. Wyoming*, the Supreme Court specifically dealt with the 1974 amendments. In a 5-4 decision, the Court stated that "[t]he extension of the ADEA to cover state and local governments, both on its face and as applied in this case, was a valid exercise of Congress' powers under the Commerce Clause." 460 U.S. at 243. The Court expressly reserved judgment, however, on whether the extension could also be upheld as an exercise of Congress' powers under section 5 of the Fourteenth Amendment. *Id.* Justice Stevens, who cast the deciding vote, concurred with the majority but limited his vote to "construing the scope and power granted to Congress by the Commerce Clause of the Constitution." *Id.* at 244. The Court declined to express an opinion on the issue a second time when, in 1991, a majority of the Court cited its decision in *E.E.O.C. v. Wyoming*, stating that Congress, in extending the ADEA to the states, acted pursuant to its Commerce Clause powers. *Gregory v. Ashcroft*, 501 U.S. 452, 469 (1991). Furthermore, Justices Burger, Powell, Rehnquist, and O'Connor in their dissent from the Supreme Court's holding in *E.E.O.C. v. Wyoming* stated that the Commerce Clause was the source of authority for both the ADEA as enacted in 1967 and the extension of coverage to the states in 1974. 460 U.S. at 251. They went on to assert that it could not be said that "in applying the Age Act to the states Congress has acted to enforce equal protection guarantees as they have been defined by this Court." *Id.* at 261.

While Congress clearly intended to abrogate Eleventh Amendment immunity and apply the protections of the ADEA to public employees, it did not have the power to do so, acting as it did under the Commerce Clause only. While the result may be regrettable,

policy arguments are best directed to the country's elected representatives in Congress and not to the unelected judiciary. Therefore, to the extent that the defendants' motion asserts the Board's Eleventh Amendment immunity from the ADEA claim, it will be granted.

## B. Title VII Claims.

A plaintiff who alleges disparate treatment based upon gender under Title VII must prove that the defendant acted with discriminatory purpose. *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984). The plaintiff can create a rebuttable presumption of discriminatory intent by establishing a prima facie case. *Young v. General Foods Corp.*, 840 F.2d 825, 829 (11th Cir. 1988), *cert. denied*, 488 U.S. 1004 (1989). A prima facie case of discrimination may be established with (1) direct evidence of discriminatory intent, (2) statistical proof of a pattern of discrimination, or (3) circumstantial evidence. *Earley v. Champion Intern. Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990).

Once the plaintiff has met this initial burden, the defendant must articulate a legitimate, nondiscriminatory rationale for the adverse employment action it took with regard to the plaintiff. *Young*, 840 F.2d at 828. The burden then shifts back to the plaintiff to prove that the defendant's asserted reason is pretextual and that the action was motivated, at least in part, by discrimination. *Id. See* 42 U.S.C. § 2000e-2(m).

> The inference of intentional discrimination raised by a plaintiff's prima facie case may be stronger or weaker, depending upon the facts of the particular case. *Grigsby v. Reynolds Metal Co.*, 821 F.2d 590, 595 (11th Cir. 1987). To a large extent, of course, the strength or weakness of the inference of discrimination created by the employee's prima facie case defines the nature of the employer's rebuttal. *See Meiri v. Dacon*, 759 F.2d 989, 997 (2d Cir. 1985). In some cases, the defendant's evidence of a legitimate non-discriminatory reason for its actions may be so strong as to rebut completely the inference raised by the plaintiff's prima facie case.

14

*Earley*, 907 F.2d at 1081.

The plaintiff does not create a factual issue by merely establishing a prima facie case. *Id.* Rather, if the defendant produces evidence of legitimate nondiscriminatory reasons for the employment action, to avoid summary judgment "the plaintiff must then present concrete evidence in the form of specific facts which show that the defendant's proffered reason is mere pretext." *Id.* The evidence must be sufficient to allow a reasonable finder of fact to conclude that the defendant's articulated reasons for its decision are not believable. *Howard v. BP Oil Co., Inc.*, 32 F.3d 520, 526 (11th Cir. 1994). The plaintiff must do more than merely challenge the defendant's credibility through conclusory allegations and assertions. *Id. See also Earley*, 907 F.2d at 1081 ("Mere conclusory allegations and assertions will not suffice.").

### 1.    Direct Evidence.

"Direct evidence of discrimination would be evidence which, if believed, would prove the existence of a fact without inference or presumption." *Carter v. City of Miami*, 870 F.2d 578, 581-82 (11th Cir. 1989). "[O]nly the most blatant remarks, whose intent could be nothing more than to discriminate . . . constitute direct evidence of discrimination." *Id.* at 582. In the instant case, the plaintiff has presented no direct evidence that the Board intended to discriminate against him.

### 2.    Statistical Proof.

A second means by which the plaintiff may show a prima facie case is by the presentation of statistical evidence that demonstrates a pattern and practice of gender discrimination. *Young v. General Foods Corp.*, 840 F.2d 825 (11th Cir. 1988), *cert. denied*,

15

488 U.S. 1004 (1989). In Bosarge's responsive submission, he asserts that "[s]ince February 1990, 5 of 7 persons were female who were hired or promoted in the Office of Public Relations and Marketing by Mike Ellis. . . . Since Bosarge left the Media Relations department, 8 of 9 vacancies in the Media Relations department have been filled by females. . . . Since February 1990, a total of 35 of 50 persons hired in the Office of Public Relations and Marketing were female." *Opponent's Responsive Submission* at 10 (citations omitted). These statistics are useless, however, for they are cited out of context. *See Brown v. American Honda Motor Co., Inc.*, 939 F.2d 946, 952 (11th Cir. 1991) ("Statistics . . . without any analytic foundation, are virtually meaningless."). The plaintiff does not give data as to the gender of the applicants for vacancies since February 1990 in the Office of Public Relations and Marketing. Without this information, one cannot determine whether the defendant truly hired a disproportionate number of females or whether the vast majority of qualified applicants were female and therefore the defendant had little choice in the matter. *See Allen v. City of Athens*, 937 F. Supp. 1531, 1546 (N.D. Ala. 1996) ("[P]laintiff would have to provide *comparative* statistics that showed the success rate of *similarly qualified* . . . applicants." (emphasis in original)). Bosarge therefore has failed to establish a prima facie case of discrimination through statistical evidence. Instead, he must attempt to do so through circumstantial evidence.

### 3.    *McDonnell Douglas* Test.

In order to meet his initial burden by using circumstantial evidence, Bosarge must satisfy the inferential test established by the United States Supreme Court in *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this test, the elements of a prima facie case may be modified to fit differing circumstances.[7]

### a.   Discriminatory Discharge Claim.

The plaintiff has asserted a claim that his position was pretextually eliminated; thus, he may establish a prima facie case by demonstrating that (1) he is a member of a protected group who was adversely affected by an employment decision; (2) he was qualified for his former position or another position at the time of the adverse decision; and (3) direct circumstantial evidence from which a fact finder might reasonably conclude that the employer, in reaching the decision at issue, intended to discriminate on the basis of the plaintiff's gender. *Early v. Champion Intern. Corp.*, 907 F.2d 1077, 1082 (11th Cir. 1990) (applying modified *McDonnell Douglas* analysis to charge of age discrimination in reduction in force ("RIF") case).[8] The Eleventh Circuit has said, "Where a particular job position is entirely eliminated for nondiscriminatory reasons, for plaintiff to prevail against his employer he must show that he was qualified for another available job with that employer; qualification for his current position is not enough." *Early*, 907 F.2d at 1082-83 (citations omitted).

---

[7] "The *McDonnell Douglas-Burdine* proof structure was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 594 (11th Cir. 1987) (citations omitted).

[8] In the Eleventh Circuit, this alteration of the *McDonnell Douglas* test for RIF cases has been applied to claims of age discrimination. The Court of Appeals in *Wilson v. AAA Plumbing Pottery Corp.* held that the same altered analysis applies as well to claims of race discrimination in which there has been a reduction in force, reasoning that the *McDonnell Douglas* methodology must be applied flexibly in order to fulfill its purpose. *See Grigsby*, 821 F.2d at 594 ("The *McDonnell Douglas-Burdine* proof structure was never intended to be rigid.") While the Court of Appeals subsequently vacated its decision, *see* 60 F.3d 744 (11th Cir. 1995), this court is persuaded by the logic of the *Wilson* opinion as concerns the altered test and is of the opinion that it should also apply to claims of gender discrimination in which there has been a RIF.

Bosarge has established three of the four elements of his prima facie case of discrimination. None of the parties dispute that he is a member of a protected class or that he was discharged. Furthermore, while he received no formal, written performance evaluations during his tenure as Program Director II or as Director of Media Relations, the undisputed facts demonstrate that Ellis thought highly of Bosarge's job performance as Director of Media Relations. Ellis' recommendation was responsible for the plaintiff's being awarded the permanent Director position, and Ellis created the new position of Program Manager II for Bosarge because he wanted to utilize the plaintiff's strengths. Shortly after creating the new position for the plaintiff, however, Ellis realized that there would not be enough money to fund it in fiscal year 1993-94 and terminated Mr. Bosarge. He did so after restructuring the Director of Media Relations position and increasing its salary by $20,000 annually in order to hire Ms. Allison for the new position. Furthermore, he and Ms. Allison received substantial annual salary increases in that same fiscal year. These undisputed facts are sufficient to establish an inference that the Board discriminated against the plaintiff when it terminated him. However, Bosarge must also demonstrate that he was qualified for another position at the time he was terminated, and this he cannot do. While the International Marketing Department created new positions around the time of the plaintiff's termination, *see Langston v. Carraway Methodist Hosps. of Ala., Inc.*, 840 F. Supp. 854, 866 (N.D. Ala. 1993) (plaintiff must show there were positions available at the time of termination), Bosarge has presented no evidence that he was qualified for them. Instead, they were filled by individuals with international marketing experience who were fluent in Spanish.

Assuming, however, that Bosarge can make out a prima facie case, his discriminatory discharge claim nevertheless fails to survive the motion for summary judgment. While the burden shifts to the Board to demonstrate that it had legitimate business reasons for its actions, the Board has met its burden. The undisputed facts establish that Ellis became aware of the need to reorganize because of the impending budgetary shortfall and to focus on international marketing and that these are the articulated reasons for terminating the plaintiff.

Consequently, the court must look to the plaintiff to present evidence sufficient to demonstrate that these reasons are merely pretextual and that his termination was motivated, at least in part, by discrimination. It is this stage of the analysis that Bosarge again fails. It is undisputed that Bosarge was asked to resign as Director of Media Relations, assuming the position of Program Manager II which was shortly thereafter eliminated. It is further undisputed that Ms. Allison's salary is $20,000 annually greater than was Bosarge's and she and Ellis both received substantial annual raises in fiscal year 1993-94, the year in which the Program Manager II position was eliminated due to budgetary constraints. Yet there is nothing other than the plaintiff's conclusory allegations to dispute that these events occurred legitimately and were not motivated by an intent on the part of the Board to discriminate against the plaintiff. The budget from which Allison and Ellis were paid was a subset of a different budget than the ones from which the plaintiff was paid. While the events of which the plaintiff complains may have been extremely unpleasant for him and perhaps even unfair, the court's role is not to alleviate such effects, but rather, to guard against discrimination. The plaintiff simply cannot prove that the

19

events were motivated, even in part, by an intent on the part of the Board to discriminate against him because he is male. Therefore, the motion for summary judgment to the extent that it concerns the Title VII discriminatory discharge claim will be granted.

### b.    Retaliation Claim.

The plaintiff alleges that the Board retaliated against him by "[n]ot paying severance pay when it became apparent that [he] wanted to retain his right to challenge the lawfulness of his termination." *Opponent's Responsive Submission* at 18. In order to make out a prima facie case of retaliatory discharge, Bosarge must show (1) statutorily protected expression, (2) adverse employment action, and (3) a causal link between the protected expression and the adverse action. *Jones v. Lumberjack Meats, Inc.*, 680 F.2d 98, 101 (11th Cir. 1982). He fails to meet his burden, however, because he was not engaged in any statutorily protected expression when UAB made its offer of a severance package.

Title VII protects employees from discrimination by employers because the employee has opposed any practice made unlawful by Title VII. 42 U.S.C. § 2000e-3(a). A plaintiff need not prove the actual existence of those unlawful employment practices; rather, he need only have a reasonable belief that the defendant engaged in such practices. *Wu v. Thomas*, 863 F.2d 1543, 1549 (11th Cir. 1989); *Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1140 (5th Cir. Unit A Sept. 1981), *cert. denied*, 449 U.S. 1077 (1982). In the Eleventh Circuit, "statutorily protected expression" includes filing an EEOC charge, 42 U.S.C. § 2000e-3(a), formal and informal complaints to an employer, *Rollins v. State of Fla. Dept. of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989), written protests,

*Smalley v. City of Eatonville*, 640 F.2d 765 (5th Cir. Unit B March 1981), and warnings from employers not to complain about alleged discriminatory practices, *Morgan v. City of Jasper*, 959 F.2d 1542, 1547 (11th Cir. 1992).

In this case, Ellis wrote to the plaintiff on March 8, 1994, confirming their conversation that Bosarge's position as Program Manager II had been eliminated and that he would be given six months severance pay. To that memorandum, Ellis attached the severance agreement which required that Bosarge release any claims against UAB as a condition of accepting the severance pay. On April 1, 1994, Ellis again wrote to Bosarge, informing him that his employment would be terminated on April 30, 1994, if he did not sign the agreement by April 8, 1994. It was not until April 6, 1994, that the plaintiff, through his counsel, indicated his unwillingness to sign the agreement. Furthermore, he filed no charge of discrimination with the EEOC until April 28, 1994. Clearly at that point Bosarge engaged in statutorily protected behavior. The court can even assume for the sake of argument that on April 6, 1994, when he announced his intention not to sign the agreement as proposed, he became engaged in such protected behavior. The conditions of UAB's offer were by then, however, already clearly established and were not proposed in reaction to any type of opposition to alleged discrimination on the part of UAB. Thus, the plaintiff has failed to present a prima facie case of retaliation, and the defendant's motion to the extent that it seeks summary judgment on this claim will be granted.

## C. Section 1983 Claim.

To state a claim pursuant to 42 U.S.C. § 1983, Bosarge must demonstrate that a person has acted "under color of any statute, ordinance, regulation, custom, or usage of

any State" to deprive him of any "rights, privileges, or immunities secured by the
Constitution and laws." 42 U.S.C. § 1983. Bosarge claims that the defendants violated
section 1983 by violating his First and Fourteenth Amendment rights.

### 1.    Qualified Immunity.

Defendants assert that the individual defendants are entitled to qualified immunity,
and, consequently, the section 1983 claim against these defendants should be dismissed.
*Movants' Initial Submission* at 22-24. "Qualified immunity protects government officials
performing discretionary functions from civil trials (and the other burdens of litigation,
including discovery) and from liability if their conduct violates no 'clearly established
statutory or constitutional rights of which a reasonable person would have known.'"
*Lassiter v. Alabama A & M Univ.*, 28 F.3d 1146, 1149 (11th Cir. 1994) (quoting *Harlow v.
Fitzgerald*, 457 U.S. 800, 818 (1982)). A right may only be clearly established where "the
contours of the right [are] sufficiently clear [so] that a reasonable official . . . understand[s]
that what he is doing violates that right." *Cofield v. Randolph County Comm'n*, 90 F.3d 468,
470 (11th Cir. 1996).

Qualified immunity almost always protects government actors; "only in exceptional
cases will [they] have no shield against claims made against them in their *individual
capacities*." *Lassiter*, 28 F.3d at 1149 (emphasis in original). In fact, qualified immunity
almost always applies to damages claims, but as the Eleventh Circuit has noted, "the
defense is a narrow one, leaving plaintiffs other avenues of relief." *Id.* at 1149 n. 2. A
plaintiff may bring a claim for damages against government actors in their official capacity
absent Eleventh Amendment immunity or may seek injunctive relief. *Id.*

The Eleventh Circuit has established a two-part analysis for qualified immunity claims. The initial burden is on the public official to establish, at the time of the occurrence of the matters complained of, that he was acting within the scope of his discretionary authority. *Zeigler v. Jackson*, 716 F.2d 847, 849 (11th Cir. 1983). Then, in order to impose liability upon defendant government officials, the plaintiff must establish the absence of objective good faith by demonstrating that "the official's alleged misconduct was 'objectively unreasonable' in that it violated clearly established law." *Schopler v. Bliss*, 903 F.2d 1373, 1380 (11th Cir. 1990) (quoting *Harlow*, 457 U.S. at 818). "For qualified immunity to be surrendered, pre-existing law must dictate, that is truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what the defendant is doing violates federal law in the circumstances." *Lassiter*, 28 F.3d at 1150.

Qualified immunity is applicable only to claims for monetary relief made against public officials acting in their individual capacities. In the case at bar, the plaintiff has made such claims against Mr. Ellis in his individual capacity and against no other defendant. The claim against the Trustees is made as to actions taken in their official capacities, and the plaintiff seeks only injunctive relief with respect to these defendants. *See Opponent's Responsive Submission* at 19. Qualified immunity is therefore inapplicable to the Trustees, but it will act to shield Mr. Ellis from liability for monetary damages. While the burden is on Bosarge to establish that Mr. Ellis, while acting in his individual capacity, violated law clearly established at that time with regard to the plaintiff's First and Fourteenth Amendment rights, the plaintiff has offered no case law which meets his burden.

The defendants' motion to the extent that it seeks Mr. Ellis' individual capacity qualified immunity from liability for monetary damages will therefore be granted. Qualified immunity, however, will not protect Ellis from possible liability for an award of injunctive relief or from liability for actions taken while acting in his official capacity.

## 2. Eleventh Amendment Immunity.

The Board, the Trustees in their official capacities, and Mike Ellis in his official capacity are all entitled to Eleventh Amendment immunity from the plaintiff's section 1983 claim. As discussed *supra*, the Eleventh Amendment bars suits by private parties "seeking to impose a liability which must be paid from public funds in the state treasury." *Edelman v. Jordan*, 415 U.S. 651, 663 (1974). Furthermore, actions for injunctive relief against a state are barred. *Alabama v. Pugh*, 438 U.S. 781, 782 (1978). The Eleventh Amendment, however, does not protect state officials acting in their official capacities from suit for injunctive relief. *Lassiter v. Alabama A & M Univ., Bd. of Trustees*, 28 F.3d 1146, 1149 n.2 (11th Cir. 1994). Eleventh Amendment immunity applies not only in actions against the state itself but also in actions brought against a "state agency or instrumentality." *Id.* The rule, however, does not apply to instances in which the state waives such immunity or Congress specifically abrogates it. With regard to section 1983 claims, however, the State of Alabama has not waived and Congress has not abrogated Alabama's Eleventh Amendment immunity. *See Gorman v. Roberts*, 909 F. Supp. 1493, 1502-03 (M.D. Ala. 1995).

Federal courts look to applicable state law to determine whether an entity can be considered a state agency or instrumentality. *Hardin v. Adams*, 760 F.2d 1158, 1163 (11th Cir.), *cert. denied*, *Grimmer v. Harden*, 474 U.S. 1007 (1985). The Alabama Supreme Court

has held that state universities are state instrumentalities.[9]  *See Rigby v. Auburn Univ.*, 448
So. 2d 345, 347 (Ala. 1984).  The Trustees and Mike Ellis are officers of the University of
Alabama, a state instrumentality, who acted in their official capacities in the case at bar.
As such, they are entitled to Eleventh Amendment immunity for their actions.  Therefore,
to the extent that the plaintiff seeks monetary relief under section 1983 from these
defendants, the motion for summary judgment will be granted.

### 3.   First and Fourteenth Amendments Claim.

After considering qualified and Eleventh Amendment immunities, the only remaining
section 1983 claim is that seeking injunctive relief against the defendants.  Bosarge avers
that the defendants violated section 1983 by infringing upon his First and Fourteenth
Amendment rights.[10]  The First Amendment right to speak freely is certainly one of the most
fundamental rights granted by the Constitution.  Furthermore, "[a] public employer may not
take adverse employment action against a public employee in retaliation for engaging in
protected speech." *Bryson v. City of Waycross*, 888 F.2d 1562, 1565 (11th Cir. 1989)).

The Eleventh Circuit has developed a four-part test to determine whether an
employee suffered such retaliation.  First, the plaintiff must prove that his speech was
protected -- that is, it can be "'fairly characterized as constituting speech on a matter of

---

[9] The Eleventh Circuit has also recognized that an Alabama state university is a state instrumentality for
Eleventh Amendment immunity purposes. *See Hardin*, 760 F.2d at 1163-64 (Eleventh Amendment bars suit under
42 U.S.C. § 1983 against Troy State University).

[10] The complaint does not specifically assert the manner in which these rights were violated.  The court
will therefore assume that Bosarge's claim is that, by conditioning his acceptance of the severance agreement
on a waiver of his right to legal redress, the defendants violated his right to free speech under the First
Amendment and as applied to the states through the Fourteenth Amendment. Alternatively, the court assumes
that he claims the defendants retaliated against him for filing a charge of discrimination with the EEOC.

public concern.'" *Id.* (quoting *Rankin v. McPherson*, 483 U.S. 378, 384 (1987)). If so, the court must "weigh[ ] the employee's first amendment interests against 'the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Bryson*, 888 F.2d at 1565 (quoting *Pickering v. Board of Educ.*, 391 U.S. 563, 568 (1968)). Should the employee prevail on the balancing test, "the fact-finder determines whether the employee's speech played a 'substantial part' in the government's decision to demote or discharge the employee." *Bryson*, 888 F.2d at 1565 (citing *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977)). Finally, if the employee shows that the speech was a substantial motivating factor in the employment decision, "the state must prove by a preponderance of the evidence that 'it would have reached the same decision . . . even in the absence of the protected conduct.'" *Bryson*, 888 F.2d at 1565 (quoting *Mt. Healthy*, 429 U.S. at 286)).

Applying this four-part test, the court must first determine whether Bosarge's speech related to a matter of "public concern." "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Meyers*, 461 U.S. 138, 146 (1983). Bosarge's purpose in speaking, therefore, is determinative -- that is, "whether [ ]he spoke on behalf of the public as a citizen, or whether [he] spoke for [him]self as an employee." *Morgan v. Ford*, 6 F.3d 750, 754 (11th Cir. 1993), *cert. denied*, 114 S. Ct. 2708 (1994).

The court is unclear as to what speech the plaintiff asserts prompted the defendants' retaliatory conduct. Possibly he asserts that he was coerced to withhold his right to speak freely when he was asked to waive in the severance agreement any claims he might have

26

against the defendants. Regardless of to which "speech" the plaintiff refers, however, there is no evidence in the record that any of it is a matter of public concern. The case merely regards one employee's contention that he was discriminated against because he is male. His speech was motivated by his desire to further his own private interest rather than to raise issues of public concern. *See Morgan*, 6 F.3d at 754. Although Bosarge has attempted to demonstrate statistically that UAB engages in a practice and pattern of such discriminatory behavior, as discussed *supra*, the proffered evidence is not probative and therefore fails to establish that the behavior is widespread and therefore a matter of possible public concern. Consequently, the plaintiff cannot meet the first prong of the four-part test, and the motion for summary judgment to the extent that it addresses the section 1983 claim for injunctive relief will be granted.

## V.    **Conclusion.**

Accordingly, the defendants' motion for summary judgment will be granted in its entirety. The court will enter an appropriate order in conformity with this memorandum of opinion.

Done, this _15th_ of January, 1997.

Edwin L. Nelson
United States District Judge

27